# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

F.R., as parent and next friend of A.R.,
a minor child,

        Plaintiff,

v.                                          No. CIV 04-1215 JH/LFG

Albuquerque Public Schools,
*et al.,*

        Defendants.

## FINDINGS OF FACT AND RECOMMENDED DISPOSITION[1]

## Introduction

THIS MATTER is before the Court on an application for approval of a settlement between the plaintiff Fabian Rodriguez as father and next friend of his minor daughter, Amber Rodriguez ("Amber"), and Defendants Albuquerque Public Schools ("APS"), Albuquerque Public School Board of Education ("Board of Education"), Patrick Jaramillo ("Jaramillo"), and Grace Brown ("Brown")

---

[1]Parties were advised of their right to file objections to this report and recommendation within ten days, pursuant to 28 U.S.C. § 636(b)(1).  However, in order to expedite the approval of this settlement, counsel and the insurance representative, appearing on behalf of Defendant, agreed at the April 19, 2005 that they had no objections to the Court's proposed findings and conclusions of law.

in their individual capacities (collectively "Defendants").[2]  Court approval is necessary because at the

time of the filing of this lawsuit Amber was a minor.[3]

## Findings

Having heard the presentations of counsel and the court-appointed Guardian *Ad Litem*,

Kathleen M.V. Oakey, along with the testimony of Fabian Rodriguez and subsequently, the

statements of Amber and her mother Erin Schafer, the Court finds:[4]

1.      On October 22, 2004, Fabian Rodriguez as father and next friend of his daughter,

Amber, filed a Complaint against Defendants.  Plaintiff alleged that his daughter, then a sophomore

at Cibola High School, was sexually assaulted by Jaramillo and that Jaramillo had previously assaulted

three other female students.  Plaintiff asserted that Jaramillo's propensities were or should have been

known to Defendants and that remaining Defendants failed to monitor or prevent Jaramillo's behavior

or were deliberately indifferent to Jaramillo's allegedly open misconduct.  Plaintiff also contended that

prior to the assault on his daughter, remaining Defendants had information that Jaramillo was

engaging in inappropriate sexual conduct with students and did nothing to put an end to this conduct

or to protect students from this sexually predatory behavior.

---

[2]A settlement was achieved before Defendants entered an appearance through counsel.  Insurance representatives appeared at all negotiations and court hearings on behalf of Defendants.

[3]he general rule is that the court must give approval to a settlement when minor children are involved. The court "has a special obligation to see that [children] are properly represented, not only by their own representatives, but also by the court itself."  Garcia v. Middle Rio Grande Conservancy Dist., 99 N.M. 802, 808, 664 P.2d 1000, 1006 (Ct. App. 1983), *overruled on other grounds by* Montoya v. AKAL Sec., Inc., 114 N.M. 354, 357, 838 P.2d 971, 974 (1992).

[4]The Court conducted three separate proceedings on the proposed settlement.  The first was conducted on January 27, 2005; the second was a follow-up telephonic conference on March 8, 2005, and the third a Court hearing held on April 19, 2005.

2.      Jaramillo was ultimately indicted by a grand jury on charges of criminal sexual contact of a minor and, at the time of the filing of this lawsuit, was a fugitive.

3.      Plaintiff brought constitutional claims against Jaramillo as well as supervisory responsibility claims under the Fourth and Fourteenth Amendments against Defendants APS and the Board of Education.  Plaintiff also asserted claims purportedly arising under the New Mexico Tort Claims Act against all Defendants.

4.      Prior to the entry of appearance and the filing of an answer or filing any motions to dismiss, Plaintiff, Plaintiff's attorney and Defendant's insurance company negotiated in good faith in an attempt to resolve the dispute.

5.      Mr. Rodriguez testified under oath at the fairness hearing that during the settlement discussions with his attorney and Defendants' insurance company, he participated in negotiations and had ultimate authority to accept or reject proposals.  He made the final decision to accept the settlement offer and noted that his daughter did not wish to proceed with litigation.

6.      During the course of settlement discussions, Mr. Rodriguez was not under the influence of any drugs, alcohol, chemical substances or inhalants that would have interfered with his ability to understand proceedings nor was he under any such influence at the time of the fairness hearing.

7.      Mr. Rodriguez testified that no one threatened him or coerced him to settle the case and that the decision to settle resulted from an exercise of his own free will.  He noted that his daughter was not undergoing any counseling or therapy and that the decision not to see a counselor was her own decision in which he concurred.  Mr. Rodriguez understood that Amber could suffer

3

emotional repercussions some time in the future related to this incident and that if he settled the case there would be no opportunity to reopen the case or seek additional damages.

8.      Mr. Rodriguez was aware of his right to refuse settlement offers and to proceed to trial, and understood that the result of trial could be different.  He was aware that at trial, it was possible for him to recover, on behalf of his daughter, substantially greater damages than offered at settlement.  So, too, it was possible that lesser damages or indeed, no damages at all could be awarded.

9.      Mr. Rodriguez understood that the settlement funds were to be used for the sole benefit of his daughter, Amber, and that at present, Amber was unsure of her future plans.  Her intent was to enter the military service but due to an unrelated  medical question her enlistment had been delayed.  Amber was also contemplating entering college after graduation from high school but had not finalized any plans.

10.      Mr. Rodriguez proposed that the entire settlement fund be turned over to his daughter so that she could utilize it for purposes of purchasing an automobile and making a down payment on the purchase of a new home which would be shared by Amber and her sister.

11.      Mr. Rodriguez's attorney, Mr. Fine, indicated that the settlement sum was $95,000 and that he believed the settlement was fair and reasonable.  He stated that his client had virtually no treatment after the incident and that it would be counterproductive to proceed with the litigation under the circumstances of the case.  Mr. Fine did not agree with Mr. Rodriguez's proposed disposition of settlement proceeds and instead recommended a structured settlement be established because of Amber's intentions to enter the military.  He believed that a structured settlement would provide protection for the settlement funds and preserve the funds for Amber's later use upon

4

discharge from the military.  Mr. Fine further indicated that if Amber did not enter the military he would still recommend that the settlement proceeds be placed in a structured settlement for Amber's future education.

12.     A Guardian *Ad Litem,* Kathleen M. V. Oakey, was appointed by the Court to serve as "an arm of the Court" for purposes of conducting an independent evaluation of the settlement and making a recommendation to the Court.  After her appointment, Ms. Oakey conducted a thorough investigation of facts leading up to the incident which gave rise to the lawsuit, interviewed the minor child and her parents, interviewed Plaintiff's counsel and conducted independent research.

13.     Ms. Oakey provided conclusions in her report.  "The following are the reasons which support my recommendation that the Court approve the $95,000 settlement as fair and reasonable:

(1)  Amber has refused to obtain any counseling or related therapy and does not expect to seek counseling;

(2)  because Amber suffered no physical injuries and received no counseling and related therapy, she has incurred no medical bills as direct result of the assault and no subrogation claim(s) or lien(s) will be paid from the settlement;

(3)  Mr. Fine has generously offered to reduce his contingent fee from 33% to 25%; and

(4)  my Guardian Ad Litem fees will be paid by CCMSI [Defendants]."

14.     At the Guardian's initial meeting with the child and her father, they agreed that the majority of the settlement money would be used to purchase an annuity with structured payments. Since that time, however, the minor child changed her mind and contrary to the advice of her attorney and the Guardian *Ad Litem* wanted to receive the entire settlement of $95,000, less attorney fees and costs, in one lump sum when she turned eighteen on February 17, 2005.

15.     The Court indicated that it would be imprudent to turn over that amount of money to someone of tender years, especially when there was evidence of the child's susceptibility to pressure from others which was demonstrated in some of the matters leading up to the assault and injury.  The Court declined to approve the lump sum payment to Amber and requested that the parties continue to explore additional options and to submit a specific proposal on how to use the money, and to demonstrate how such a plan is in Amber's best interest.

16.     Since the date of the first fairness hearing, the Court conducted follow-up conferences with counsel and learned that the Guardian had obtained various structured settlement proposals.  Further, the Court was apprised that Amber, acting without her attorney's consent or approval of the Guardian *ad litem,* executed a purchase agreement on a home.  The Court advised that it would not authorize the use of settlement monies for the purchase of the home without additional information.  Subsequently, the Court was advised that neither Amber nor her parents qualified for a mortgage.

17.     Prior to the second fairness hearing conducted on April 19, 2005, Amber executed a second purchase agreement with different lender.  The lender was not a traditional mortgage company but according to her attorney was a higher risk investment company that generally anticipates the likelihood of a default.  The interest rate related to the second purchase agreement was substantially higher than current mortgage rates.  Under the proposed financing, for example, the monthly payment for the first year was estimated at $600 per month, for the second year, $700 per month and for the third year, $800 per month, at which point it would level off.  The company would issue a mortgage contingent on the entire amount of the settlement proceeds being paid down on the house.  There was no assurance, however, that Amber could continue to make payments on the mortgage as required by the note.  The payments exceed her available disposible income.

18.     Moreover, purchasing the home virtually assures that Amber would have to work full time rather than pursuing educational opportunities or entering military service as she had originally proposed.

19.     The Court concluded that the real estate purchase was too risky and that there was a likelihood that the investment would be lost.  Accordingly, the proposed home purchase was rejected.  With the rejection of the home purchase, Amber agreed to a structured annuity.

20.     The Guardian *Ad Litem* proposed an annuity purchased through Hartford Life Insurance Company that would commence on June 10, 2005 and would guarantee Amber a monthly payment to Amber of $400 for 25 months ending on June 10, 2007.  The guaranteed yield during that period would be $10,000.  Thereafter, Amber would receive a lump sum distribution of $10,000 on February 17, 2008 at age 21, an additional lump sum distribution of $10,000 on February 17, 2112 at age 25, and a lump sum distribution of $73,823 on February 17, 2022 at age 35.  The guaranteed pay out on this structure is $103,823, and the cost of the annuity would be $60,000.  This would leave approximately $9400 that would be paid to Amber upon the Court's approval of the settlement and dismissal of the lawsuit.  The bulk of that money will be used by Amber for a vehicle purchase or any other need she may have.

21.     Both Amber's attorney and the Guardian *Ad Litem* recommend approval this plan.

22.     The Court informed the parties that the settlement was contingent on the trial judge's acceptance of the Magistrate Judge's recommendations.  The parties each waived their right to object to the findings and recommendation of the Magistrate Judge and waived the 10-day period for objections.

7

**Conclusions of Law**

After consideration of the evidence, applicable law, testimony and presentation of parties, counsel, and the Guardian *Ad Litem*, the undersigned Magistrate Judge concludes that the Court has jurisdiction over the parties and subject matter, and further concludes that this settlement is in the child's best interest, that her parents understand their obligations, and that suitable arrangements have been made to manage the settlement proceeds.  Therefore, the Court recommends that the settlement be approved and that this case be dismissed with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge

8